(Slip Opinion) OCTOBER TERM, 2012 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ARIZONA ET AL. *v*. INTER TRIBAL COUNCIL OF ARIZONA, INC., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 12–71.   Argued March 18, 2013—Decided June 17, 2013

The National Voter Registration Act of 1993 (NVRA) requires States to "accept and use" a uniform federal form to register voters for federal elections.  42 U. S. C. §1973gg–4(a)(1).  That "Federal Form," developed by the federal Election Assistance Commission (EAC), requires only that an applicant aver, under penalty of perjury, that he is a citizen.  Arizona law, however, requires voter-registration officials to "reject" any application for registration, including a Federal Form, that is not accompanied by documentary evidence of citizenship.  Respondents, a group of individual Arizona residents and a group of nonprofit organizations, sought to enjoin that Arizona law.  Ultimately, the District Court granted Arizona summary judgment on respondents' claim that the NVRA pre-empts Arizona's requirement.  The Ninth Circuit affirmed in part but reversed as relevant here, holding that the state law's documentary-proof-of-citizenship requirement is pre-empted by the NVRA.

*Held*: Arizona's evidence-of-citizenship requirement, as applied to Federal Form applicants, is pre-empted by the NVRA's mandate that States "accept and use" the Federal Form.  Pp. 4–18.

   (a) The Elections Clause imposes on States the duty to prescribe the time, place, and manner of electing Representatives and Senators, but it confers on Congress the power to alter those regulations or supplant them altogether.   See *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 804–805.   This Court has said that the terms "Times, Places, and Manner" "embrace authority to provide a complete code for congressional elections," including regulations relating to "registration."  *Smiley* v. *Holm*, 285 U. S. 355, 366.  Pp. 4–6.

   (b) Because "accept and use" are words "that can have more than

one meaning," they "are given content . . . by their surroundings." *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 466. Reading "accept" merely to denote willing receipt seems out of place in the context of an official mandate to accept and use something for a given purpose. The implication of such a mandate is that its object is to be accepted as sufficient for the requirement it is meant to satisfy. Arizona's reading is also difficult to reconcile with neighboring NVRA provisions, such as §1973gg–6(a)(1)(B) and §1973gg–4(a)(2).

Arizona's appeal to the presumption against pre-emption invoked in this Court's Supremacy Clause cases is inapposite. The power the Elections Clause confers is none other than the power to pre-empt. Because Congress, when it acts under this Clause, is always on notice that its legislation will displace some element of a pre-existing legal regime erected by the States, the reasonable assumption is that the text of Elections Clause legislation accurately communicates the scope of Congress's pre-emptive intent.

Nonetheless, while the NVRA forbids States to demand that an applicant submit additional information beyond that required by the Federal Form, it does not preclude States from "deny[ing] registration based on information in their possession establishing the applicant's ineligibility." Pp. 6–13.

(c) Arizona is correct that the Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them. The latter is the province of the States. See U. S. Const., Art. I, §2, cl. 1; Amdt. 17. It would raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications. The NVRA can be read to avoid such a conflict, however. Section 1973gg–7(b)(1) permits the EAC to include on the Federal Form information "necessary to enable the appropriate State election official to assess the eligibility of the applicant." That validly conferred discretionary executive authority is properly exercised (as the Government has proposed) to require the inclusion of Arizona's concrete-evidence requirement if such evidence is necessary to enable Arizona to enforce its citizenship qualification.

The NVRA permits a State to request the EAC to include state-specific instructions on the Federal Form, see 42 U. S. C. §1973gg–7(a)(2), and a State may challenge the EAC's rejection of that request (or failure to act on it) in a suit under the Administrative Procedure Act. That alternative means of enforcing its constitutional power to determine voting qualifications remains open to Arizona here. Should the EAC reject or decline to act on a renewed request, Arizona would have the opportunity to establish in a reviewing court that a mere oath will not suffice to effectuate its citizenship requirement and that the EAC is therefore under a nondiscretionary duty to in-

Syllabus

clude Arizona's concrete-evidence requirement on the Federal Form. Pp. 13–17.

677 F. 3d 383, affirmed.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined, and in which KENNEDY, J., joined in part. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment. THOMAS, J., and ALITO, J., filed dissenting opinions.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

___

No. 12–71

___

## ARIZONA, ET AL., PETITIONERS *v.* THE INTER TRIBAL COUNCIL OF ARIZONA, INC., ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 17, 2013]

JUSTICE SCALIA delivered the opinion of the Court.

The National Voter Registration Act requires States to "accept and use" a uniform federal form to register voters for federal elections. The contents of that form (colloquially known as the Federal Form) are prescribed by a federal agency, the Election Assistance Commission. The Federal Form developed by the EAC does not require documentary evidence of citizenship; rather, it requires only that an applicant aver, under penalty of perjury, that he is a citizen. Arizona law requires voter-registration officials to "reject" any application for registration, including a Federal Form, that is not accompanied by concrete evidence of citizenship. The question is whether Arizona's evidence-of-citizenship requirement, as applied to Federal Form applicants, is pre-empted by the Act's mandate that States "accept and use" the Federal Form.

I

Over the past two decades, Congress has erected a complex superstructure of federal regulation atop state voter-registration systems. The National Voter Registration Act of 1993 (NVRA), 107 Stat. 77, as amended, 42

U. S. C. §1973gg *et seq.,* "requires States to provide simplified systems for registering to vote in *federal* elections." *Young* v. *Fordice,* 520 U. S. 273, 275 (1997). The Act requires each State to permit prospective voters to "register to vote in elections for Federal office" by any of three methods: simultaneously with a driver's license application, in person, or by mail. §1973gg–2(a).

This case concerns registration by mail. Section 1973gg–2(a)(2) of the Act requires a State to establish procedures for registering to vote in federal elections "by mail application pursuant to section 1973gg–4 of this title." Section 1973gg–4, in turn, requires States to "accept and use" a standard federal registration form. §1973gg–4(a)(1). The Election Assistance Commission is invested with rulemaking authority to prescribe the contents of that Federal Form. §1973gg–7(a)(1); see §15329.[1] The EAC is explicitly instructed, however, to develop the Federal Form "in consultation with the chief election officers of the States." §1973gg–7(a)(2). The Federal Form thus contains a number of state-specific instructions, which tell residents of each State what additional information they must provide and where they must submit the form. See National Mail Voter Registration Form, pp. 3–20, online at http://www.eac.gov (all Internet materials as visited June 11, 2013, and available in Clerk of Court's case file); 11 CFR §9428.3 (2012). Each state-specific instruction must be approved by the EAC before it is included on the Federal Form.

To be eligible to vote under Arizona law, a person must be a citizen of the United States. Ariz. Const., Art. VII, §2; Ariz. Rev. Stat. Ann. §16–101(A) (West 2006). This case concerns Arizona's efforts to enforce that qualification. In

---

[1] The Help America Vote Act of 2002 transferred this function from the Federal Election Commission to the EAC. See §802, 116 Stat. 1726, codified at 42 U. S. C. §§15532, 1973gg–7(a).

2004, Arizona voters adopted Proposition 200, a ballot initiative designed in part "to combat voter fraud by requiring voters to present proof of citizenship when they register to vote and to present identification when they vote on election day." *Purcell* v. *Gonzalez*, 549 U. S. 1, 2 (2006) (*per curiam*).[2] Proposition 200 amended the State's election code to require county recorders to "reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship." Ariz. Rev. Stat. Ann. §16–166(F) (West Supp. 2012). The proof-of-citizenship requirement is satisfied by (1) a photocopy of the applicant's passport or birth certificate, (2) a driver's license number, if the license states that the issuing authority verified the holder's U. S. citizenship, (3) evidence of naturalization, (4) tribal identification, or (5) "[o]ther documents or methods of proof . . . established pursuant to the Immigration Reform and Control Act of 1986." *Ibid.* The EAC did not grant Arizona's request to include this new requirement among the state-specific instructions for Arizona on the Federal Form. App. 225. Consequently, the Federal Form includes a statutorily required attestation, subscribed to under penalty of perjury, that an Arizona applicant meets the State's voting requirements (including the citizenship requirement), see §1973gg–7(b)(2), but does not require concrete evidence of citizenship.

The two groups of plaintiffs represented here—a group of individual Arizona residents (dubbed the Gonzalez plaintiffs, after lead plaintiff Jesus Gonzalez) and a group of nonprofit organizations led by the Inter Tribal Council of Arizona (ITCA)—filed separate suits seeking to enjoin the voting provisions of Proposition 200. The District

---

[2] In May 2005, the United States Attorney General precleared under §5 of the Voting Rights Act of 1965 the procedures Arizona adopted to implement Proposition 200. *Purcell,* 549 U. S., at 3.

Court consolidated the cases and denied the plaintiffs' motions for a preliminary injunction. App. to Pet. for Cert. 1g. A two-judge motions panel of the Court of Appeals for the Ninth Circuit then enjoined Proposition 200 pending appeal. *Purcell,* 549 U. S., at 3. We vacated that order and allowed the impending 2006 election to proceed with the new rules in place. *Id.,* at 5–6. On remand, the Court of Appeals affirmed the District Court's initial denial of a preliminary injunction as to respondents' claim that the NVRA pre-empts Proposition 200's registration rules. *Gonzales* v. *Arizona*, 485 F. 3d 1041, 1050–1051 (2007). The District Court then granted Arizona's motion for summary judgment as to that claim. App. to Pet. for Cert. 1e, 3e. A panel of the Ninth Circuit affirmed in part but reversed as relevant here, holding that "Proposition 200's documentary proof of citizenship requirement conflicts with the NVRA's text, structure, and purpose." *Gonzales* v. *Arizona*, 624 F. 3d 1162, 1181 (2010). The en banc Court of Appeals agreed. *Gonzalez* v. *Arizona*, 677 F. 3d 383, 403 (2012). We granted certiorari. 568 U. S. ___ (2012).

## II

The Elections Clause, Art. I, §4, cl. 1, provides:

> "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators."

The Clause empowers Congress to pre-empt state regulations governing the "Times, Places and Manner" of holding congressional elections. The question here is whether the federal statutory requirement that States "accept and use" the Federal Form pre-empts Arizona's state-law require-

ment that officials "reject" the application of a prospective voter who submits a completed Federal Form unaccompanied by documentary evidence of citizenship.

## A

The Elections Clause has two functions. Upon the States it imposes the duty ("*shall* be prescribed") to prescribe the time, place, and manner of electing Representatives and Senators; upon Congress it confers the power to alter those regulations or supplant them altogether. See *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 804–805 (1995); *id.,* at 862 (THOMAS, J., dissenting). This grant of congressional power was the Framers' insurance against the possibility that a State would refuse to provide for the election of representatives to the Federal Congress. "[E]very government ought to contain in itself the means of its own preservation," and "an exclusive power of regulating elections for the national government, in the hands of the State legislatures, would leave the existence of the Union entirely at their mercy. They could at any moment annihilate it by neglecting to provide for the choice of persons to administer its affairs." The Federalist No. 59, pp. 362–363 (C. Rossiter ed. 1961) (A. Hamilton) (emphasis deleted). That prospect seems fanciful today, but the widespread, vociferous opposition to the proposed Constitution made it a very real concern in the founding era.

The Clause's substantive scope is broad. "Times, Places, and Manner," we have written, are "comprehensive words," which "embrace authority to provide a complete code for congressional elections," including, as relevant here and as petitioners do not contest, regulations relating to "registration." *Smiley* v. *Holm*, 285 U. S. 355, 366 (1932); see also *Roudebush* v. *Hartke*, 405 U. S. 15, 24–25 (1972) (recounts); *United States* v. *Classic*, 313 U. S. 299, 320 (1941) (primaries). In practice, the Clause functions as "a default provision; it invests the States with responsi-

bility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices." *Foster* v. *Love*, 522 U. S. 67, 69 (1997) (citation omitted). The power of Congress over the "Times, Places and Manner" of congressional elections "is paramount, and may be exercised at any time, and to any extent which it deems expedient; and so far as it is exercised, and no farther, the regulations effected supersede those of the State which are inconsistent therewith." *Ex parte Siebold*, 100 U. S. 371, 392 (1880).

B

The straightforward textual question here is whether Ariz. Rev. Stat. Ann. §16–166(F), which requires state officials to "reject" a Federal Form unaccompanied by documentary evidence of citizenship, conflicts with the NVRA's mandate that Arizona "accept and use" the Federal Form. If so, the state law, "so far as the conflict extends, ceases to be operative." *Siebold, supra,* at 384. In Arizona's view, these seemingly incompatible obligations can be read to operate harmoniously: The NVRA, it contends, requires merely that a State receive the Federal Form willingly and use that form as one element in its (perhaps lengthy) transaction with a prospective voter.

Taken in isolation, the mandate that a State "accept and use" the Federal Form is fairly susceptible of two interpretations. It might mean that a State must accept the Federal Form as a complete and sufficient registration application; or it might mean that the State is merely required to receive the form willingly and use it *somehow* in its voter registration process. Both readings—"receive willingly" and "accept as sufficient"—are compatible with the plain meaning of the word "accept." See 1 Oxford English Dictionary 70 (2d ed. 1989) ("To take or receive (a thing offered) willingly"; "To receive as sufficient or adequate"); Webster's New International Dictionary 14 (2d ed. 1954)

("To receive (a thing offered to or thrust upon one) with a consenting mind"; "To receive with favor; to approve"). And we take it as self-evident that the "elastic" verb "use," read in isolation, is broad enough to encompass Arizona's preferred construction. *Smith* v. *United States*, 508 U. S. 223, 241 (1993) (SCALIA, J., dissenting). In common parlance, one might say that a restaurant accepts and uses credit cards even though it requires customers to show matching identification when making a purchase. See also Brief for State Petitioners 40 ("An airline may advertise that it 'accepts and uses' e-tickets . . . , yet may still require photo identification before one could board the airplane").

"Words that can have more than one meaning are given content, however, by their surroundings." *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 466 (2001); see also *Smith, supra,* at 241 (SCALIA, J., dissenting). And reading "accept" merely to denote willing receipt seems out of place in the context of an official mandate to accept and use something for a given purpose. The implication of such a mandate is that its object is to be accepted *as sufficient* for the requirement it is meant to satisfy. For example, a government *diktat* that "civil servants shall accept government IOUs for payment of salaries" does not invite the response, "sure, we'll accept IOUs—if you pay us a ten percent down payment in cash." Many federal statutes contain similarly phrased commands, and they contemplate more than mere willing receipt. See, *e.g.,* 5 U. S. C. §8332(b), (m)(3) ("The Office [of Personnel Management] shall accept the certification of" various officials concerning creditable service toward civilian-employee retirement); 12 U. S. C. A. §2605(*l*)(2) (Supp. 2013) ("A servicer of a federally related mortgage shall accept any reasonable form of written confirmation from a borrower of existing insurance coverage"); 16 U. S. C. §1536(p) (Endangered Species Committee "shall accept the determinations of the

President" with respect to whether a major disaster war-
rants an exception to the Endangered Species Act's re-
quirements); §4026(b)(2), 118 Stat. 3725, note following 22
U. S. C. §2751, p. 925 (FAA Administrator "shall accept
the certification of the Department of Homeland Security
that a missile defense system is effective and functional to
defend commercial aircraft against" man-portable surface-
to-air missiles); 25 U. S. C. §1300h–6(a) ("For the purpose
of proceeding with the per capita distribution" of certain
funds, "the Secretary of the Interior shall accept the tribe's
certification of enrolled membership"); 30 U. S. C. §923(b)
(the Secretary of Labor "shall accept a board certified or
board eligible radiologist's interpretation" of a chest X ray
used to diagnose black lung disease); 42 U. S. C. §1395w–
21(e)(6)(A) ("[A] Medicare+Choice organization . . . shall
accept elections or changes to elections during" specified
periods).[3]

Arizona's reading is also difficult to reconcile with
neighboring provisions of the NVRA. Section 1973gg–
6(a)(1)(B) provides that a State shall "ensure that any
eligible applicant is registered to vote in an election . . . if
the *valid voter registration form* of the applicant is post-
marked" not later than a specified number of days before
the election. (Emphasis added.) Yet Arizona reads the
phrase "accept and use" in §1973gg–4(a)(1) as permitting
it to *reject* a completed Federal Form if the applicant does
not submit additional information required by state law.
That reading can be squared with Arizona's obligation

_____

[3]The dissent accepts that a State may not impose additional re-
quirements that render the Federal Form *entirely* superfluous; it would
require that the State "us[e] the form as a meaningful part of the
registration process." *Post,* at 7 (opinion of ALITO, J.). The dissent does
not tell us precisely how large a role for the Federal Form suffices to
make it "meaningful": One step out of two? Three? Ten? There is no
easy answer, for the dissent's "meaningful part" standard is as inde-
terminate as it is atextual.

under §1973gg–6(a)(1) only if a completed Federal Form is not a "valid voter registration form," which seems unlikely. The statute empowers the EAC to create the Federal Form, §1973gg–7(a), requires the EAC to prescribe its contents within specified limits, §1973gg–7(b), and requires States to "accept and use" it, §1973gg–4(a)(1). It is improbable that the statute envisions a completed copy of the form it takes such pains to create as being anything less than "valid."

The Act also authorizes States, "*[i]n addition to* accepting and using the" Federal Form, to create their own, state-specific voter-registration forms, which can be used to register voters in both state and federal elections. §1973gg–4(a)(2) (emphasis added). These state-developed forms may require information the Federal Form does not. (For example, unlike the Federal Form, Arizona's registration form includes Proposition 200's proof-of-citizenship requirement. See Arizona Voter Registration Form, p. 1, online at http://www.azsos.gov.) This permission works in tandem with the requirement that States "accept and use" the Federal Form. States retain the flexibility to design and use their own registration forms, but the Federal Form provides a backstop: No matter what procedural hurdles a State's own form imposes, the Federal Form guarantees that a simple means of registering to vote in federal elections will be available.[4] Arizona's reading

———————

[4] In the face of this straightforward explanation, the dissent maintains that it would be "nonsensical" for a less demanding federal form to exist alongside a more demanding state form. *Post,* at 9 (opinion of ALITO, J.). But it is the dissent's alternative explanation for §1973gg–4(a)(2) that makes no sense. The "purpose" of the Federal Form, it claims, is "to facilitate interstate voter registration drives. Thanks to the federal form, volunteers distributing voter registration materials at a shopping mall in Yuma can give a copy of the same form to every person they meet without attempting to distinguish between residents of Arizona and California." *Post,* at 9. But in the dissent's world, a volunteer in Yuma would have to give every prospective voter not only

would permit a State to demand of Federal Form applicants every additional piece of information the State requires on its state-specific form. If that is so, the Federal Form ceases to perform any meaningful function, and would be a feeble means of "increas[ing] the number of eligible citizens who register to vote in elections for Federal office." §1973gg(b).

Finally, Arizona appeals to the presumption against pre-emption sometimes invoked in our Supremacy Clause cases. See, *e.g., Gregory* v. *Ashcroft*, 501 U. S. 452, 460–461 (1991). Where it applies, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). That rule of construction rests on an assumption about congressional intent: that "Congress does not exercise lightly" the "extraordinary power" to "legislate in areas traditionally regulated by the States." *Gregory, supra,* at 460. We have never mentioned such a principle in our Elections Clause cases.[5] *Siebold*, for example, simply said that Elections

—————

a Federal Form, but also a separate set of either Arizona- or California-specific instructions detailing the additional information the applicant must submit to the State. In ours, every eligible voter can be assured that if he does what the Federal Form says, he will be registered. The dissent therefore provides yet another compelling reason to interpret the statute our way.

[5] *United States* v. *Gradwell*, 243 U. S. 476 (1917), on which the dissent relies, see *post,* at 3–4 (opinion of ALITO, J.), is not to the contrary— indeed, it was not even a pre-emption case. In *Gradwell*, we held that a statute making it a federal crime "to defraud the United States" did not reach election fraud. 243 U. S., at 480, 483. The Court noted that the provision at issue was adopted in a tax-enforcement bill, and that Congress had enacted but then repealed *other* criminal statutes specifically covering election fraud. *Id.,* at 481–483.

The dissent cherry-picks some language from a sentence in *Gradwell*, see *post,* at 3–4, but the full sentence reveals its irrelevance to our case:

Clause legislation, "so far as it extends and conflicts with the regulations of the State, necessarily supersedes them." 100 U. S., at 384. There is good reason for treating Elections Clause legislation differently: The assumption that Congress is reluctant to pre-empt does not hold when Congress acts under that constitutional provision, which empowers Congress to "make or alter" state election regulations. Art. I, §4, cl. 1. When Congress legislates with respect to the "Times, Places and Manner" of holding congressional elections, it *necessarily* displaces some element of a pre-existing legal regime erected by the States.[6] Because the power the Elections Clause confers is

_____

"With it thus clearly established that the policy of Congress for so great a part of our constitutional life has been, and now is, to leave the conduct of the election of its members to state laws, administered by state officers, and that whenever it has assumed to regulate such elections it has done so by positive and clear statutes, such as were enacted in 1870, it would be a strained and unreasonable construction to apply to such elections this §37, originally a law for the protection of the revenue and for now fifty years confined in its application to 'Offenses against the Operations of the Government' as distinguished from the processes by which men are selected to conduct such operations." 243 U. S*.,* at 485.

*Gradwell* says nothing at all about pre-emption, or about how to construe statutes (like the NVRA) in which Congress has *indisputably* undertaken "to regulate such elections." *Ibid.*

[6] The dissent counters that this is so "whenever Congress legislates in an area of concurrent state and federal power." *Post,* at 5 (opinion of ALITO, J.). True, but irrelevant: Elections Clause legislation is unique precisely because it *always* falls within an area of concurrent state and federal power. Put differently, *all* action under the Elections Clause displaces some element of a pre-existing state regulatory regime, because the text of the Clause confers the power to do exactly (and only) that. By contrast, even laws enacted under the Commerce Clause (arguably the other enumerated power whose exercise is most likely to trench on state regulatory authority) will not always implicate concurrent state power—a prohibition on the interstate transport of a commodity, for example.

none other than the power to pre-empt, the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent. Moreover, the federalism concerns underlying the presumption in the Supremacy Clause context are somewhat weaker here. Unlike the States' "historic police powers," *Rice, supra,* at 230, the States' role in regulating congressional elections—while weighty and worthy of respect—has always existed subject to the express qualification that it "terminates according to federal law." *Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U. S. 341, 347 (2001). In sum, there is no compelling reason not to read Elections Clause legislation simply to mean what it says.

We conclude that the fairest reading of the statute is that a state-imposed requirement of evidence of citizenship not required by the Federal Form is "inconsistent with" the NVRA's mandate that States "accept and use" the Federal Form. *Siebold, supra*, at 397. If this reading prevails, the Elections Clause requires that Arizona's rule give way.

We note, however, that while the NVRA forbids States to demand that an applicant submit additional information beyond that required by the Federal Form, it does not preclude States from "deny[ing] registration based on information in their possession establishing the applicant's ineligibility."[7] Brief for United States as *Amicus Curiae* 24. The NVRA clearly contemplates that not every submitted Federal Form will result in registration. See

_____

[7]The dissent seems to think this position of ours incompatible with our reading of §1973gg–6(a)(1)(B), which requires a State to "ensure that any eligible applicant is registered to vote in an election . . . if the valid voter registration form of the applicant is postmarked" by a certain date. See *post,* at 9–10 (opinion of ALITO, J.). What the dissent overlooks is that §1973gg–6(a)(1)(B) only requires a State to register an "*eligible* applicant" who submits a timely Federal Form. (Emphasis added.)

§1973gg–7(b)(1) (Federal Form "may require only" information "necessary to enable the appropriate State election official to *assess the eligibility of the applicant*" (emphasis added)); §1973gg–6(a)(2) (States must require election officials to "send notice to each applicant of the disposition of the application").

## III

Arizona contends, however, that its construction of the phrase "accept and use" is necessary to avoid a conflict between the NVRA and Arizona's constitutional authority to establish qualifications (such as citizenship) for voting. Arizona is correct that the Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them. The Constitution prescribes a straightforward rule for the composition of the federal electorate. Article I, §2, cl. 1, provides that electors in each State for the House of Representatives "shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature," and the Seventeenth Amendment adopts the same criterion for senatorial elections. Cf. also Art. II, §1, cl. 2 ("Each State shall appoint, in such Manner as the Legislature thereof may direct," presidential electors). One cannot read the Elections Clause as treating implicitly what these other constitutional provisions regulate explicitly. "It is difficult to see how words could be clearer in stating what Congress can control and what it cannot control. Surely nothing in these provisions lends itself to the view that voting qualifications in federal elections are to be set by Congress." *Oregon* v. *Mitchell,* 400 U. S. 112, 210 (1970) (Harlan, J., concurring in part and dissenting in part); see also *U. S. Term Limits,* 514 U. S., at 833–834; *Tashjian* v. *Republican Party of Conn.,* 479 U. S. 208, 231–232 (1986) (Ste-

vens, J., dissenting).[8]

Prescribing voting qualifications, therefore, "forms no part of the power to be conferred upon the national government" by the Elections Clause, which is "expressly restricted to the regulation of the *times*, the *places*, and the *manner* of elections." The Federalist No. 60, at 371 (A. Hamilton); see also *id.*, No. 52, at 326 (J. Madison). This allocation of authority sprang from the Framers' aversion to concentrated power. A Congress empowered to regulate the qualifications of its own electorate, Madison warned, could "by degrees subvert the Constitution." 2 Records of the Federal Convention of 1787, p. 250 (M. Farrand rev. 1966). At the same time, by tying the federal franchise to the state franchise instead of simply placing it within the unfettered discretion of state legislatures, the Framers avoided "render[ing] too dependent on the State governments that branch of the federal govern-

―――――――

[8] In *Mitchell*, the judgment of the Court was that Congress could compel the States to permit 18-year-olds to vote in federal elections. Of the five Justices who concurred in that outcome, only Justice Black was of the view that congressional power to prescribe this age qualification derived from the Elections Clause, 400 U. S., at 119–125, while four Justices relied on the Fourteenth Amendment, *id.,* at 144 (opinion of Douglas, J.), 231 (joint opinion of Brennan, White, and Marshall, JJ.). That result, which lacked a majority rationale, is of minimal precedential value here. See *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 66 (1996); *Nichols* v. *United States*, 511 U. S. 738, 746 (1994); H. Black, Handbook on the Law of Judicial Precedents 135–136 (1912). Five Justices took the position that the Elections Clause did *not* confer upon Congress the power to regulate voter qualifications in federal elections. *Mitchell, supra,* at 143 (opinion of Douglas, J.), 210 (opinion of Harlan, J.), 288 (opinion of Stewart, J., joined by Burger, C. J., and Blackmun, J.). (Justices Brennan, White, and Marshall did not address the Elections Clause.) This last view, which commanded a majority in *Mitchell*, underlies our analysis here. See also *U. S. Term Limits*, 514 U. S., at 833. Five Justices also agreed that the Fourteenth Amendment did not empower Congress to impose the 18-year-old-voting mandate. See *Mitchell, supra,* at 124–130 (opinion of Black, J.), 155 (opinion of Harlan, J.), 293–294 (opinion of Stewart, J.).

ment which ought to be dependent on the people alone." The Federalist No. 52, at 326 (J. Madison).

Since the power to establish voting requirements is of little value without the power to enforce those require- ments, Arizona is correct that it would raise serious con- stitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications.[9]  If, but for Arizona's interpretation of the "accept and use" provision, the State would be pre- cluded from obtaining information necessary for enforce- ment, we would have to determine whether Arizona's interpretation, though plainly not the best reading, is at least a possible one.  Cf. *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932) (the Court will "ascertain whether a construction of the statute *is fairly possible* by which the [constitutional] question may be avoided" (emphasis added)).  Happily, we are spared that necessity, since the statute provides another means by which Arizona may obtain information needed for enforcement.

Section 1973gg–7(b)(1) of the Act provides that the Federal Form "may require only such identifying infor- mation (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibil- ity of the applicant and to administer voter registration and other parts of the election process."  At oral argument,

_____

[9] In their reply brief, petitioners suggest for the first time that "regis- tration is itself a qualification to vote."  Reply Brief for State Petition- ers 24 (emphasis deleted); see also *post,* at 1, 16 (opinion of THOMAS, J.); cf. *Voting Rights Coalition* v. *Wilson*, 60 F. 3d 1411, 1413, and n. 1 (CA9 1995), cert. denied, 516 U. S. 1093 (1996); *Association of Community Organizations for Reform Now (ACORN)* v. *Edgar*, 56 F. 3d 791, 793 (CA7 1995).  We resolve this case on the theory on which it has hitherto been litigated: that *citizenship* (not registration) is the voter qualifica- tion Arizona seeks to enforce.  See Brief for State Petitioners 50.

the United States expressed the view that the phrase "may require only" in §1973gg–7(b)(1) means that the EAC "*shall require* information that's necessary, but may only require that information." Tr. of Oral Arg. 52 (emphasis added); see also Brief for ITCA Respondents 46; Tr. of Oral Arg. 37–39 (ITCA Respondents' counsel). That is to say, §1973gg–7(b)(1) acts as both a ceiling and a floor with respect to the contents of the Federal Form. We need not consider the Government's contention that despite the statute's statement that the EAC "may" require on the Federal Form information "necessary to enable the appropriate State election official to assess the eligibility of the applicant," other provisions of the Act indicate that such action is statutorily required. That is because we think that—by analogy to the rule of statutory interpretation that avoids questionable constitutionality—validly conferred discretionary executive authority is properly exercised (as the Government has proposed) to avoid serious constitutional doubt. That is to say, it is surely permissible if not requisite for the Government to say that necessary information which *may* be required *will* be required.

Since, pursuant to the Government's concession, a State may request that the EAC alter the Federal Form to include information the State deems necessary to determine eligibility, see §1973gg–7(a)(2); Tr. of Oral Arg. 55 (United States), and may challenge the EAC's rejection of that request in a suit under the Administrative Procedure Act, see 5 U. S. C. §701–706, no constitutional doubt is raised by giving the "accept and use" provision of the NVRA its fairest reading. That alternative means of enforcing its constitutional power to determine voting qualifications remains open to Arizona here. In 2005, the EAC divided 2-to-2 on the request by Arizona to include the evidence-of-citizenship requirement among the state-specific instructions on the Federal Form, App. 225, which meant that no action could be taken, see 42 U. S. C. §15328 ("Any action

which the Commission is authorized to carry out under this chapter may be carried out only with the approval of at least three of its members"). Arizona did not challenge that agency action (or rather inaction) by seeking APA review in federal court, see Tr. of Oral Arg. 11–12 (Arizona), but we are aware of nothing that prevents Arizona from renewing its request.[10] Should the EAC's inaction persist, Arizona would have the opportunity to establish in a reviewing court that a mere oath will not suffice to effectuate its citizenship requirement and that the EAC is therefore under a nondiscretionary duty to include Arizona's concrete evidence requirement on the Federal Form. See 5 U. S. C. §706(1). Arizona might also assert (as it has argued here) that it would be arbitrary for the EAC to refuse to include Arizona's instruction when it has accepted a similar instruction requested by Louisiana.[11]

*     *     *

We hold that 42 U. S. C. §1973gg–4 precludes Arizona

---

[10] We are aware of no rule promulgated by the EAC preventing a renewed request. Indeed, the whole request process appears to be entirely informal, Arizona's prior request having been submitted by e-mail. See App. 181.

The EAC currently lacks a quorum—indeed, the Commission has not a single active Commissioner. If the EAC proves unable to act on a renewed request, Arizona would be free to seek a writ of mandamus to "compel agency action unlawfully withheld or unreasonably delayed." 5 U. S. C. §706(1). It is a nice point, which we need not resolve here, whether a court can compel agency action that the agency itself, for lack of the statutorily required quorum, is incapable of taking. If the answer to that is no, Arizona might then be in a position to assert a constitutional right to demand concrete evidence of citizenship apart from the Federal Form.

[11] The EAC recently approved a state-specific instruction for Louisiana requiring applicants who lack a Louisiana driver's license, ID card, or Social Security number to attach additional documentation to the completed Federal Form. See National Mail Voter Registration Form, p. 9; Tr. of Oral Arg. 57 (United States).

from requiring a Federal Form applicant to submit information beyond that required by the form itself.  Arizona may, however, request anew that the EAC include such a requirement among the Federal Form's state-specific instructions, and may seek judicial review of the EAC's decision under the Administrative Procedure Act.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 12–71

ARIZONA, ET AL., PETITIONERS *v.* THE INTER
TRIBAL COUNCIL OF ARIZONA, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 17, 2013]

JUSTICE KENNEDY, concurring in part and concurring in
the judgment.

The opinion for the Court insists on stating a proposi-
tion that, in my respectful view, is unnecessary for the
proper disposition of the case and is incorrect in any event.
The Court concludes that the normal "starting presump-
tion that Congress does not intend to supplant state law,"
*New York State Conference of Blue Cross & Blue Shield
Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 654 (1995), does
not apply here because the source of congressional power
is the Elections Clause and not some other provision of the
Constitution. See *ante,* at 10–12.

There is no sound basis for the Court to rule, for the
first time, that there exists a hierarchy of federal powers
so that some statutes pre-empting state law must be in-
terpreted by different rules than others, all depending
upon which power Congress has exercised. If the Court is
skeptical of the basic idea of a presumption against pre-
emption as a helpful instrument of construction in express
pre-emption cases, see *Cipollone* v. *Liggett Group, Inc.*,
505 U. S. 504, 545 (1992) (SCALIA, J., concurring in judg-
ment in part and dissenting in part), it should say so and
apply that skepticism across the board.

There are numerous instances in which Congress, in the
undoubted exercise of its enumerated powers, has stated

its express purpose and intent to pre-empt state law. But the Court has nonetheless recognized that "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Altria Group, Inc.* v. *Good,* 555 U. S. 70, 77 (2008) (quoting *Bates* v. *Dow Agrosciences LLC,* 544 U. S. 431, 449 (2005)). This principle is best understood, perhaps, not as a presumption but as a cautionary principle to ensure that pre-emption does not go beyond the strict requirements of the statutory command. The principle has two dimensions: Courts must be careful not to give an unduly broad interpretation to ambiguous or imprecise language Congress uses. And they must confine their opinions to avoid overextending a federal statute's pre-emptive reach. Error on either front may put at risk the validity and effectiveness of laws that Congress did not intend to disturb and that a State has deemed important to its scheme of governance. That concern is the same regardless of the power Congress invokes, whether it is, say, the commerce power, the war power, the bankruptcy power, or the power to regulate federal elections under Article I, §4.

Whether the federal statute concerns congressional regulation of elections or any other subject proper for Congress to address, a court must not lightly infer a congressional directive to negate the States' otherwise proper exercise of their sovereign power. This case illustrates the point. The separate States have a continuing, essential interest in the integrity and accuracy of the process used to select both state and federal officials. The States pay the costs of holding these elections, which for practical reasons often overlap so that the two sets of officials are selected at the same time, on the same ballots, by the same voters. It seems most doubtful to me to suggest that States have some lesser concern when what is involved is their own historic role in the conduct of elections. As

already noted, it may be that a presumption against pre-emption is not the best formulation of this principle, but in all events the State's undoubted interest in the regulation and conduct of elections must be taken into account and ought not to be deemed by this Court to be a subject of secondary importance.

Here, in my view, the Court is correct to conclude that the National Voter Registration Act of 1993 is unambiguous in its pre-emption of Arizona's statute. For this reason, I concur in the judgment and join all of the Court's opinion except its discussion of the presumption against pre-emption. See *ante,* at 10–12.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–71

_____

ARIZONA, ET AL., PETITIONERS *v.* THE INTER
TRIBAL COUNCIL OF ARIZONA, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 17, 2013]

JUSTICE THOMAS, dissenting.

This case involves the federal requirement that States "accept and use," 42 U. S. C. §1973gg–4(a)(1), the federal voter registration form created pursuant to the National Voter Registration Act (NVRA). The Court interprets "accept and use," with minor exceptions, to require States to register any individual who completes and submits the federal form. It, therefore, holds that §1973gg–4(a)(1) preempts an Arizona law requiring additional information to register. As the majority recognizes, *ante*, at 13–15, its decision implicates a serious constitutional issue— whether Congress has power to set qualifications for those who vote in elections for federal office.

I do not agree, and I think that both the plain text and the history of the Voter Qualifications Clause, U. S. Const., Art. I, §2, cl. 1, and the Seventeenth Amendment authorize States to determine the qualifications of voters in federal elections, which necessarily includes the related power to determine whether those qualifications are satisfied. To avoid substantial constitutional problems created by interpreting §1973gg–4(a)(1) to permit Congress to effectively countermand this authority, I would construe the law as only requiring Arizona to accept and use the form as part of its voter registration process, leaving the State free to request whatever additional information it

determines is necessary to ensure that voters meet the qualifications it has the constitutional authority to establish. Under this interpretation, Arizona did "accept and use" the federal form. Accordingly, there is no conflict between Ariz. Rev. Stat. Ann. §16–166(F) (West Cum. Supp. 2012) and §1973gg–4(a)(1) and, thus, no pre-emption.

## I

In 2002, Congress created the Election Assistance Commission (EAC), 42 U. S. C. §15321 *et seq.*, and gave it the ongoing responsibility of "develop[ing] a mail voter registration application form for elections for Federal office" "in consultation with the chief election officers of the States." §1973gg–7(a)(2). Under the NVRA, "[e]ach State shall accept and use the mail voter registration application form" the EAC develops. §1973gg–4(a)(1). The NVRA also states in a subsequent provision that "[i]n addition to accepting and using the form described in paragraph (1), a State may develop and use a mail voter registration form . . . for the registration of voters in elections for Federal office" so long as it satisfies the same criteria as the federal form. §1973gg–4(a)(2).

Section 1973gg–7(b) enumerates the criteria for the federal form. The form "may require only such identifying information . . . and other information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant." §1973gg–7(b)(1). The federal form must also "specif[y] each eligibility requirement (including citizenship)," "contai[n] an attestation that the applicant meets each such requirement," and "requir[e] the signature of the applicant, under penalty of perjury." §§1973gg–7(b)(2)(A)–(C). Insofar as citizenship is concerned, the standard federal form contains the bare statutory requirements; individuals seeking to vote need only attest that they are citizens and sign under penalty of

perjury.

Arizona has had a citizenship requirement for voting since it became a State in 1912. See Ariz. Const., Art. VII, §2. In 2004, Arizona citizens enacted Proposition 200, the law at issue in this case. Proposition 200 provides that "[t]he county recorder shall reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship." Ariz. Rev. Stat. Ann. §16–166(F). The law sets forth several examples of satisfactory evidence, including driver's license number, birth certificate, U. S. passport, naturalization documents, and various tribal identification documents for Indians. §16–166(F)(1)–(6).

Respondents, joined by the United States, allege that these state requirements are pre-empted by the NVRA's mandate that all States "accept and use" the federal form promulgated by the EAC. §1973gg–4(a)(1). They contend that the phrase "accept and use" requires a State presented with a completed federal form to register the individual to vote without requiring any additional information.

Arizona advances an alternative interpretation. It argues that §1973gg–4(a)(1) is satisfied so long as the State "accepts and use[s]" the federal form as *part* of its voter qualification process. For example, a State "accepts and use[s]" the federal form by allowing individuals to file it, even if the State requires additional identifying information to establish citizenship. In Arizona's view, it "accepts and uses" the federal form in the same way that an airline "accepts and uses" electronic tickets but also requires an individual seeking to board a plane to demonstrate that he is the person named on the ticket. Brief for State Petitioners 40. See also 677 F. 3d 383, 446 (CA9 2012) (Rawlinson, J., concurring in part and dissenting in part) ("[M]erchants may accept and use credit cards, but a customer's production of a credit card in and of itself may not be sufficient. The customer must sign and may have

to provide photo identification to verify that the customer is eligible to use the credit card").

JUSTICE ALITO makes a compelling case that Arizona's interpretation is superior to respondents'. See *post*, at 6–10 (dissenting opinion). At a minimum, however, the interpretations advanced by Arizona and respondents are both plausible. See 677 F. 3d, at 439 (Kozinski, C.J., concurring) (weighing the arguments). The competing interpretations of §1973gg–4(a)(1) raise significant constitutional issues concerning Congress' power to decide who may vote in federal elections. Accordingly, resolution of this case requires a better understanding of the relevant constitutional provisions.

## II
## A

The Voter Qualifications Clause, U. S. Const., Art. I, §2, cl. 1, provides that "the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature" in elections for the federal House of Representatives. The Seventeenth Amendment, which provides for direct election of Senators, contains an identical clause. That language is susceptible of only one interpretation: States have the authority "to control who may vote in congressional elections" so long as they do not "establish special requirements that do not apply in elections for the state legislature." *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 864–865 (1995) (THOMAS, J., dissenting); see also The Federalist No. 57, p. 349 (C. Rossiter ed. 2003) (J. Madison) ("The electors . . . are to be the same who exercise the right in every State of electing the corresponding branch of the legislature of the State"). Congress has no role in setting voter qualifications, or determining whether they are satisfied, aside from the powers conferred by the Fourteenth, Fifteenth, Nineteenth, Twenty-Fourth, and Twenty-

Sixth Amendments, which are not at issue here. This power is instead expressly reposed in the States.

### 1

The history of the Voter Qualifications Clause's enactment confirms this conclusion. The Framers did not intend to leave voter qualifications to Congress. Indeed, James Madison explicitly rejected that possibility:

> "The definition of the right of suffrage is very justly regarded as a fundamental article of republican government. It was incumbent on the convention, therefore, to define and establish this right in the Constitution. *To have left it open for the occasional regulation of the Congress would have been improper.*" The Federalist No. 52, at 323 (emphasis added).

Congressional legislation of voter qualifications was not part of the Framers' design.

The Constitutional Convention did recognize a danger in leaving Congress "too dependent on the State governments" by allowing States to define congressional elector qualifications without limitation. *Ibid.* To address this concern, the Committee of Detail that drafted Article I, §2, "weighed the possibility of a federal property requirement, as well as several proposals that would have given the federal government the power to impose its own suffrage laws at some future time." A. Keyssar, The Right to Vote 18 (rev. ed. 2009) (hereafter Keyssar); see also 2 The Records of the Federal Convention of 1787, pp. 139–140, 151, 153, 163–165 (M. Farrand rev. ed. 1966) (text of several voter qualification provisions considered by the Committee of Detail).

These efforts, however, were ultimately abandoned. Even if the convention had been able to agree on a uniform federal standard, the Framers knew that state ratification conventions likely would have rejected it. Madison ex-

plained that "reduc[ing] the different qualifications in the different States to one uniform rule would probably have been as dissatisfactory to some of the States as it would have been difficult to the convention." The Federalist No. 52, at 323; see also J. Story, Commentaries on the Constitution of the United States 217 (abridged ed. 1833) (same). Justice Story elaborated that setting voter qualifications in the Constitution could have jeopardized ratification, because it would have been difficult to convince States to give up their right to set voting qualifications. *Id.*, at 216, 218–219. See also Keyssar 306–313 (Tables A.1 and A.2) (state-by-state analysis of 18th- and 19th-century voter qualifications, including property, taxpaying, residency, sex, and race requirements).

The Convention, thus, chose to respect the varied state voting rules and instead struck the balance enshrined in Article I, §2's requirement that federal electors "shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." That compromise gave States free reign over federal voter qualifications but protected Congress by prohibiting States from changing the qualifications for federal electors unless they also altered qualifications for their own legislatures. See The Federalist No. 52, at 323. This balance left the States with nearly complete control over voter qualifications.

2

Respondents appear to concede that States have the sole authority to establish voter qualifications, see, *e.g.*, Brief for Gonzalez Respondents 63, but nevertheless argue that Congress can determine whether those qualifications are satisfied. See, *e.g.*, *id.*, at 61. The practical effect of respondents' position is to read Article I, §2, out of the Constitution. As the majority correctly recognizes, "the power to establish voting requirements is of little value without the power to enforce those requirements." See *ante*, at 15.

For this reason, the Voter Qualifications Clause gives States the authority not only to set qualifications but also the power to verify whether those qualifications are satisfied.

This understanding of Article I, §2, is consistent with powers enjoyed by the States at the founding. For instance, ownership of real or personal property was a common prerequisite to voting, see Keyssar 306–313 (Tables A.1 and A.2). To verify that this qualification was satisfied, States might look to proof of tax payments. See C. Williamson, American Suffrage from Property to Democracy, 1760–1860, p. 32 (1960). In other instances, States relied on personal knowledge of fellow citizens to verify voter eligibility. Keyssar 24 ("In some locales, particularly in the South, voting was still an oral and public act: men assembled before election judges, waited for their names to be called, and then announced which candidates they supported"). States have always had the power to ensure that only those qualified under state law to cast ballots exercised the franchise.

Perhaps in part because many requirements (such as property ownership or taxpayer status) were independently documented and verifiable, States in 1789 did not generally "register" voters using highly formalized procedures. See *id.,* at 122. Over time, States replaced their informal systems for determining eligibility, with more formalized pre-voting registration regimes. See An Act in Addition to the Several Acts for Regulating Elections, 1800 Mass. Acts ch. 74, in Acts and Laws of the Commonwealth of Massachusetts 96 (1897) (Massachusetts' 1801 voter registration law). But modern voter registration serves the same basic purpose as the practices used by States in the Colonies and early Federal Republic. The fact that States have liberalized voting qualifications and streamlined the verification process through registration does not alter the basic fact that States possess broad

authority to set voter qualifications and to verify that they are met.

B

Both text and history confirm that States have the exclusive authority to set voter qualifications and to determine whether those qualifications are satisfied. The United States nevertheless argues that Congress has the authority under Article I, §4, "to set the rules for voter registration in federal elections." Brief for United States as *Amicus Curiae* 33 (hereafter Brief for United States). Neither the text nor the original understanding of Article I, §4, supports that position.

1

Article I, §4, gives States primary responsibility for regulating the "Times, Places and Manner of holding Elections" and authorizes Congress to "at any time by Law make or alter such Regulations."[1] Along with the Seventeenth Amendment, this provision grants Congress power only over the "when, where, and how" of holding congressional elections. T. Parsons, Notes of Convention Debates, Jan. 16, 1788, in 6 Documentary History of the Ratification of the Constitution 1211 (J. Kaminski & G. Saladino eds. 2000) (hereinafter Documentary History) (Massachusetts ratification delegate Sedgwick) (emphasis omitted); see also *ante*, at 13 ("Arizona is correct that [Article I, §4,] empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them").

Prior to the Constitution's ratification, the phrase "manner of election" was commonly used in England, Scotland, Ireland, and North America to describe the

_____

[1] The majority refers to Article I, §4, cl. 1, as the "Elections Clause." See, *e.g.*, *ante*, at 4. Since there are a number of Clauses in the Constitution dealing with elections, I refer to it using the more descriptive term, Times, Places and Manner Clause.

entire election process. Natelson, The Original Scope of the Congressional Power to Regulate Elections, 13 U. Pa. J. Constitutional L. 1, 10–18 (2010) (citing examples). But there are good reasons for concluding that Article I, §4's use of "Manner" is considerably more limited. *Id.*, at 20. The Constitution does not use the word "Manner" in isolation; rather, "after providing for qualifications, times, and places, the Constitution described the residuum as 'the Manner of holding Elections.' This precise phrase seems to have been newly coined to denote a subset of traditional 'manner' regulation." *Ibid.* (emphasis deleted; footnote omitted). Consistent with this view, during the state ratification debates, the "Manner of holding Elections" was construed to mean the circumstances under which elections were held and the mechanics of the actual election. See 4 Debates in the Several State Conventions on the Adoption of the Federal Constitution 71 (J. Elliot 2d ed. 1863) (hereafter Elliot's Debates) ("The power over the manner of elections does not include that of saying who shall vote . . . the power over the manner only enables them to determine *how* those electors shall elect—whether by ballot, or by vote, or by any other way" (John Steele at the North Carolina ratification debates)); A Pennsylvanian to the New York Convention, Pennsylvania Gazette, June 11, 1788, in 20 Documentary History 1145 (J. Kaminski, G. Saladino, R. Leffler, & C. Schoenleber eds. 2004) (same); Brief for Center for Constitutional Jurisprudence as *Amicus Curiae* 6–7 (same, citing state ratification debates). The text of the Times, Places and Manner Clause, therefore, cannot be read to authorize Congress to dictate voter eligibility to the States.

2

Article I, §4, also cannot be read to limit a State's authority to set voter qualifications because the more specific language of Article I, §2, expressly gives that authority to

the States. See *ante*, at 13 ("One cannot read [Article I, §4,] as treating implicitly what [Article I, §2, and Article II, §1,] regulate explicitly"). As the Court observed just last Term, "[a] well established canon of statutory interpretation succinctly captures the problem: '[I]t is a commonplace of statutory construction that the specific governs the general.'" *RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*, 566 U. S. ___, ___ (2012) (slip op., at 5) (quoting *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 384 (1992); second alteration in original). The Court explained that this canon is particularly relevant where two provisions "'are interrelated and closely positioned, both in fact being parts of [the same scheme.]'" 566 U. S., at ___ (slip op., at 5) (quoting *HCSC-Laundry* v. *United States*, 450 U. S. 1, 6 (1981) (*per curiam*)). Here, the general Times, Places and Manner Clause is textually limited by the directly applicable text of the Voter Qualification Clause.

The ratification debates over the relationship between Article I, §§2 and 4, demonstrate this limitation. Unlike Article I, §2, the Times, Places and Manner Clause was the subject of extensive ratification controversy. Antifederalists were deeply concerned with ceding authority over the conduct of elections to the Federal Government. Some antifederalists claimed that the "'wealthy and the well-born,'" might abuse the Times, Places and Manner Clause to ensure their continuing power in Congress. The Federalist No. 60, at 368. Hamilton explained why Article I, §2's Voter Qualifications Clause foreclosed this argument:

> "The truth is that there is no method of securing to the rich the preference apprehended but by prescribing qualifications of property either for those who may elect or be elected. But this forms no part of the power to be conferred upon the national government. Its authority would be expressly restricted to the regula-

tion of the *times*, the *places*, and the *manner* of elections." *Id.*, at 369.

Ratification debates in several States echoed Hamilton's argument. The North Carolina debates provide a particularly direct example. There, delegate John Steele relied on the established "maxim of universal jurisprudence, of reason and common sense, that an instrument or deed of writing shall be construed as to give validity to all parts of it, if it can be done without involving any absurdity" in support of the argument that Article I, §2's grant of voter qualifications to the States required a limited reading of Article I, §4. 4 Elliot's Debates 71.

This was no isolated view. See 2 *id.,* at 50–51 (Massachusetts delegate Rufus King observing that "the power of control given by [Article I, §4,] extends to the *manner* of election, not the *qualifications* of the electors"); 4 *id.,* at 61 (same, North Carolina's William Davie); 3 *id.,* at 202–203 (same, Virginia delegate Edmund Randolph); Roger Sherman, A Citizen of New Haven: Observations on the New Federal Constitution, Connecticut Courant, Jan. 7, 1788, in 15 Documentary History 282 (J. Kaminski & G. Saladino eds. 1983) (same); A Freeman [Letter] II (Tench Coxe), Pennsylvania Gazette, Jan. 30, 1788, in *id.,* at 508 (same). It was well understood that congressional power to regulate the "Manner" of elections under Article I, §4, did not include the power to override state voter qualifications under Article I, §2.

3

The concern that gave rise to Article I, §4, also supports this limited reading. The Times, Places and Manner Clause was designed to address the possibility that States might refuse to hold any federal elections at all, eliminating Congress, and by extension the Federal Government. As Hamilton explained, "every government ought to contain in itself the means of its own preservation." The

Federalist No. 59, at 360 (emphasis deleted); see also *U. S. Term Limits, Inc.*, 514 U. S., at 863 (THOMAS, J., dissenting) (Article I, §4, designed "to ensure that the States hold congressional elections in the first place, so that Congress continues to exist"); *id.*, at 863, and n. 10 (same, citing ratification era sources). Reflecting this understanding of the reasoning behind Article I, §4, many of the original 13 States proposed constitutional amendments that would have strictly cabined the Times, Places and Manner Clause to situations in which state failure to hold elections threatened the continued existence of Congress. See 2 Elliot's Debates 177 (Massachusetts); 18 Documentary History 71–72 (J. Kaminski & G. Saladino eds. 1995) (South Carolina); *id.,* at 187–188 (New Hampshire); 3 Elliot's Debates 661 (Virginia); Ratification of the Constitution by the State of New York (July 26, 1788) (New York), online at http://avalon.law.yale.edu/18th_century/ratny.asp (all Internet materials as visited June 6, 2013, and available in Clerk of Court's case file); 4 Elliot's Debates 249 (North Carolina); Ratification of the Constitution by the State of Rhode Island (May 29, 1790) (Rhode Island), online at http://avalon.law.yale.edu/18th_century/ratri.asp. Although these amendments were never enacted, they underscore how narrowly the ratification conventions construed Congress' power under the Times, Places and Manner Clause. In contrast to a state refusal to hold federal elections at all, a state decision to alter the qualifications of electors for state legislature (and thereby for federal elections as well) does not threaten Congress' very existence.

## C

Finding no support in the historical record, respondents and the United States instead chiefly assert that this Court's precedents involving the Times, Places and Manner Clause give Congress authority over voter qualifica-

tions. See, *e.g.*, Brief for Respondent Inter Tribal Council of Arizona, Inc. (ITCA) et al. 30–31, 48–50 (hereafter Brief for ITCA Respondents; Brief for Gonzalez Respondents 44–50; Brief for United States 24–27, 31–33. But this Court does not have the power to alter the terms of the Constitution. Moreover, this Court's decisions do not support the respondents' and the Government's position.

Respondents and the United States point out that *Smiley* v. *Holm*, 285 U. S. 355 (1932), mentioned "registration" in a list of voting-related subjects it believed Congress could regulate under Article I, §4. *Id.,* at 366 (listing "notices, *registration*, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns" (emphasis added)). See Brief for ITCA Respondents 49; Brief for Gonzalez Respondents 48; Brief for United States 21. But that statement was dicta because *Smiley* involved congressional redistricting, not voter registration. 285 U. S., at 361–362. Cases since *Smiley* have similarly not addressed the issue of voter qualifications but merely repeated the word "registration" without further analysis. See *Cook* v. *Gralike*, 531 U. S. 510, 523 (2001); *Roudebush* v. *Hartke*, 405 U. S. 15, 24 (1972).

Moreover, in *Oregon* v. *Mitchell*, 400 U. S. 112 (1970), a majority of this Court, "took the position that [Article I, §4,] did *not* confer upon Congress the power to regulate voter qualifications in federal elections," as the majority recognizes. *Ante*, at 14, n. 8. See *Mitchell*, 400 U. S., at 288 (Stewart, J., concurring in part and dissenting in part); *id.,* at 210–212 (Harlan, J., concurring in part and dissenting in part); *id.,* at 143 (opinion of Douglas, J.). And even the majority's decision in *U. S. Term Limits*, from which I dissented, recognized that Madison's Federalist No. 52 "explicitly contrasted the *state control over the qualifications of electors*" with what it believed was "the

lack of state control over the qualifications of the elected." 514 U. S., at 806 (emphasis added). Most of the remaining cases cited by respondents and the Government merely confirm that Congress' power to regulate the "Manner of holding Elections" is limited to regulating events surrounding the when, where, and how of actually casting ballots. See, *e.g.*, *United States* v. *Classic*, 313 U. S. 299 (1941) (upholding federal regulation of ballot fraud in primary voting); *Ex parte Yarbrough*, 110 U. S. 651 (1884) (upholding federal penalties for intimidating voter in congressional election); see also *Foster* v. *Love*, 522 U. S. 67 (1997) (overturning Louisiana primary system whose winner was deemed elected if he received a majority of votes in light of federal law setting the date of federal general elections); *Roudebush*, *supra* (upholding Indiana ballot recount procedures in close Senate election as within state power under Article I, §4). It is, thus, difficult to maintain that the Times, Places and Manner Clause gives Congress power beyond regulating the casting of ballots and related activities, even as a matter of precedent.[2]

---

[2] Article I, §§2 and 4, and the Seventeenth Amendment concern congressional elections. The NVRA's "accept and use" requirement applies to *all* federal elections, even presidential elections. See §1973gg–4(a)(1). This Court has recognized, however, that "the state legislature's power to select the manner for appointing [presidential] electors is plenary; it may, if it chooses, select the electors itself." *Bush* v. *Gore*, 531 U. S. 98, 104 (2000) (*per curiam*) (citing U. S. Const., Art. II, §1, and *McPherson* v. *Blacker*, 146 U. S. 1, 35 (1892)). As late as 1824, six State Legislatures chose electoral college delegates, and South Carolina continued to follow this model through the 1860 election. 1 Guide to U. S. Elections 821 (6th ed. 2010). Legislatures in Florida in 1868 and Colorado in 1876 chose delegates, *id.,* at 822, and in recent memory, the Florida Legislature in 2000 convened a special session to consider how to allocate its 25 electoral votes if the winner of the popular vote was not determined in time for delegates to participate in the electoral college, see James, Election 2000: Florida Legislature Faces Own Disputes over Electors, Wall Street Journal, Dec. 11, 2000, p. A16, though it ultimately took no action. See Florida's Senate Adjourns

### III
#### A

Arizona has not challenged the constitutionality of the NVRA itself in this case. Nor has it alleged that Congress lacks authority to direct the EAC to create the federal form. As a result, I need not address those issues. Arizona did, however, argue that respondent's interpretation of §1973gg–4(a)(1) would raise constitutional concerns. As discussed, *supra*, I too am concerned that respondent's interpretation of §1973gg–4(a)(1) would render the statute unconstitutional under Article I, §2. Accordingly, I would interpret §1973gg–4(a)(1) to avoid the constitutional problems discussed above. See *Zadvydas* v. *Davis*, 533 U. S. 678, 689 (2001) ("'[I]t is a cardinal principle' of statutory interpretation, however, that when an Act of Congress raises 'a serious doubt' as to its constitutionality, 'this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided'" (quoting *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932))).

I cannot, therefore, adopt the Court's interpretation that §1973gg–4(a)(1)'s "accept and use" provision requires states to register anyone who completes and submits the form. Arizona sets citizenship as a qualification to vote, and it wishes to verify citizenship, as it is authorized to do under Article 1, §2. It matters not whether the United States has specified one way in which *it* believes Arizona might be able to verify citizenship; Arizona has the independent constitutional authority to verify citizenship in the way it deems necessary. See in Part II–A–2, *supra*. By requiring Arizona to register people who have not

---

Without Naming Electors, Wall Street Journal, Dec. 15, 2000, p. A6. Constitutional avoidance is especially appropriate in this area because the NVRA purports to regulate presidential elections, an area over which the Constitution gives Congress no authority whatsoever.

demonstrated to Arizona's satisfaction that they meet its citizenship qualification for voting, the NVRA, as interpreted by the Court, would exceed Congress' powers under Article I, §4, and violate Article 1, §2.

Fortunately, Arizona's alternative interpretation of §1973gg–4(a)(1) avoids this problem. It is plausible that Arizona "accept[s] and use[s]" the federal form under §1973gg–4(a)(1) so long as it receives the form and considers it as part of its voter application process. See *post*, at 6–10 (ALITO, J., dissenting); 677 F. 3d, at 444 (Rawlinson, J., concurring in part and dissenting in part); 624 F. 3d 1162, 1205–1208 (CA9 2010) (Kozinski, C. J., dissenting in part), reh'g 649 F. 3d 953 (CA9 2011); 677 F. 3d, at 439 (Kozinski, C. J., concurring) (same). Given States' exclusive authority to set voter qualifications and to determine whether those qualifications are met, I would hold that Arizona may request whatever additional information it requires to verify voter eligibility.

## B

The majority purports to avoid the difficult constitutional questions implicated by the Voter Qualifications Clause. See *ante*, at 13–15. It nevertheless adopts respondents' reading of §1973gg–4(a)(1) because it interprets Article I, §2, as giving Arizona the right only to "obtai[n] information necessary for enforcement" of its voting qualifications. *Ante*, at 15. The majority posits that Arizona may pursue relief by making an administrative request to the EAC that, if denied, could be challenged under the Administrative Procedure Act (APA). *Ante,* at 15–17.

JUSTICE ALITO is correct to point out that the majority's reliance on the EAC is meaningless because the EAC has no members and no current prospects of new members. *Post,* at 6 (dissenting opinion). Offering a nonexistent pathway to administrative relief is an exercise in futility,

not constitutional avoidance.

Even if the EAC were a going concern instead of an empty shell, I disagree with the majority's application of the constitutional avoidance canon. I would not require Arizona to seek approval for its registration requirements from the Federal Government, for, as I have shown, the Federal Government does not have the constitutional authority to withhold such approval. Accordingly, it does not have the authority to command States to seek it. As a result, the majority's proposed solution does little to avoid the serious constitutional problems created by its interpretation.

\*    \*    \*

Instead of adopting respondents' definition of "accept and use" and offering Arizona the dubious recourse of bringing an APA challenge within the NVRA framework, I would adopt an interpretation of §1973gg–4(a)(1) that avoids the constitutional problems with respondents' interpretation. The States, not the Federal Government, have the exclusive right to define the "Qualifications requisite for Electors," U. S. Const., Art. I, §2, cl. 1, which includes the corresponding power to verify that those qualifications have been met. I would, therefore, hold that Arizona may "reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship," as defined by Arizona law. Ariz. Rev. Stat. Ann. §16–166(F).

I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

No. 12–71

ARIZONA, ET AL., PETITIONERS *v.* THE INTER
TRIBAL COUNCIL OF ARIZONA, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 17, 2013]

JUSTICE ALITO, dissenting.

The Court reads an ambiguous federal statute in a way that brushes aside the constitutional authority of the States and produces truly strange results.

Under the Constitution, the States, not Congress, have the authority to establish the qualifications of voters in elections for Members of Congress. See Art. I, §2, cl. 1 (House); Amdt. 17 (Senate). The States also have the default authority to regulate federal voter registration. See Art. I, §4, cl. 1. Exercising its right to set federal voter qualifications, Arizona, like every other State, permits only U. S. citizens to vote in federal elections, and Arizona has concluded that this requirement cannot be effectively enforced unless applicants for registration are required to provide proof of citizenship. According to the Court, however, the National Voter Registration Act of 1993 (NVRA) deprives Arizona of this authority. I do not think that this is what Congress intended.

I also doubt that Congress meant for the success of an application for voter registration to depend on which of two valid but substantially different registration forms the applicant happens to fill out and submit, but that is how the Court reads the NVRA. The Court interprets one provision, 42 U. S. C. §1973gg–6(a)(1)(B), to mean that, if an applicant fills out the federal form, a State must regis-

ter the applicant without requiring proof of citizenship. But the Court does not question Arizona's authority under another provision of the NVRA, §1973gg–4(a)(2), to create its own application form that demands proof of citizenship; nor does the Court dispute Arizona's right to refuse to register an applicant who submits that form without the requisite proof. I find it very hard to believe that this is what Congress had in mind.

These results are not required by the NVRA. Proper respect for the constitutional authority of the States demands a clear indication of a congressional intent to preempt state laws enforcing voter qualifications. And while the relevant provisions of the Act are hardly models of clarity, their best reading is that the States need not treat the federal form as a complete voter registration application.

## I
## A

In light of the States' authority under the Elections Clause of the Constitution, Art. I, §4, cl. 1, I would begin by applying a presumption against pre-emption of the Arizona law requiring voter registration applicants to submit proof of citizenship. Under the Elections Clause, the States have the authority to specify the times, places, and manner of federal elections except to the extent that Congress chooses to provide otherwise. And in recognition of this allocation of authority, it is appropriate to presume that the States retain this authority unless Congress has clearly manifested a contrary intent. The Court states that "[w]e have never mentioned [the presumption against pre-emption] in our Elections Clause cases," *ante,* at 10, but in *United States* v. *Gradwell,* 243 U. S. 476 (1917), we read a federal statute narrowly out of deference to the States' traditional authority in this area. In doing so, we explained that "the policy of Congress for [a] great . . . part

of our constitutional life has been . . . to leave the conduct of the election of its members to state laws, administered by state officers, and that *whenever it has assumed to regulate such elections it has done so by positive and clear statutes.*" *Id.*, at 485 (emphasis added).[1] The presumption against pre-emption applies with full force when Congress legislates in a "field which the States have traditionally occupied," *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947), and the NVRA was the first significant federal regulation of voter registration enacted under the Elections Clause since Reconstruction.

The Court has it exactly backwards when it declines to apply the presumption against pre-emption because "the federalism concerns underlying the presumption in the Supremacy Clause context are somewhat weaker" in an Elections Clause case like this one. *Ante,* at 12. To the contrary, Arizona has a "'compelling interest in preserving the integrity of its election process'" that the Constitution recognizes and that the Court's reading of the Act seriously undermines. *Purcell* v. *Gonzalez*, 549 U. S. 1, 4 (2006) (*per curiam*) (quoting *Eu* v. *San Francisco County Democratic Central Comm.*, 489 U. S. 214, 231 (1989)).

By reserving to the States default responsibility for administering federal elections, the Elections Clause protects several critical values that the Court disregards. First, as Madison explained in defense of the Elections Clause at the Virginia Convention, "[i]t was found neces-

---

[1] The Court argues that *Gradwell* is irrelevant, observing that there was no state law directly at issue in that case, which concerned a prosecution under a federal statute. *Ante*, at 10, n. 5. But the same is true of *Ex parte Siebold*, 100 U. S. 371 (1880), on which the Court relies in the very next breath. In any event, it is hard to see why a presumption about the effect of federal law on the conduct of congressional elections should have less force when the federal law is alleged to conflict with a state law. If anything, one would expect the opposite to be true.

sary to leave the regulation of [federal elections], in the first place, to the state governments, as being best acquainted with the situation of the people." 3 Records of the Federal Convention of 1787, p. 312 (M. Farrand ed. 1911). Because the States are closer to the people, the Framers thought that state regulation of federal elections would "in ordinary cases . . . be both more convenient and more satisfactory." The Federalist No. 59, p. 360 (C. Rossiter ed. 1961) (A. Hamilton).

Second, as we have previously observed, the integrity of federal elections is a subject over which the States and the Federal Government "are mutually concerned." *Ex parte Siebold*, 100 U. S. 371, 391 (1880). By giving States a role in the administration of federal elections, the Elections Clause reflects the States' interest in the selection of the individuals on whom they must rely to represent their interests in the National Legislature. See *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 858–859 (1995) (THOMAS, J., dissenting).

Third, the Elections Clause's default rule helps to protect the States' authority to regulate state and local elections. As a practical matter, it would be very burdensome for a State to maintain separate federal and state registration processes with separate federal and state voter rolls. For that reason, any federal regulation in this area is likely to displace not only state control of federal elections but also state control of state and local elections.

Needless to say, when Congress believes that some overriding national interest justifies federal regulation, it has the power to "make or alter" state laws specifying the "Times, Places and Manner" of federal elections. Art. I, §4, cl. 1. But we should expect Congress to speak clearly when it decides to displace a default rule enshrined in the text of the Constitution that serves such important purposes.

The Court answers that when Congress exercises its

power under the Elections Clause "it *necessarily* displaces some element of a pre-existing legal regime erected by the States." *Ante,* at 11. But the same is true whenever Congress legislates in an area of concurrent state and federal power. A federal law regulating the operation of grain warehouses, for example, necessarily alters the "pre-existing legal regime erected by the States," see *Rice, supra*, at 229–230—even if only by regulating an activity the States had chosen not to constrain.[2] In light of Arizona's constitutionally codified interest in the integrity of its federal elections, "it is incumbent upon the federal courts to be certain" that Congress intended to pre-empt Arizona's law. *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 243 (1985).

## B

The canon of constitutional avoidance also counsels against the Court's reading of the Act. As the Court acknowledges, the Constitution reserves for the States the power to decide who is qualified to vote in federal elections. *Ante,* at 13–15; see *Oregon* v. *Mitchell*, 400 U. S. 112, 210–211 (1970) (Harlan, J., concurring in part and dissenting in part). The Court also recognizes that, although Congress generally has the authority to regulate the "Times, Places and Manner of holding" such elections,

--------

[2] The Court observes that the Commerce Clause, unlike the Elections Clause, empowers Congress to legislate in areas that do not implicate concurrent state power. *Ante,* at 12, n. 6. Apparently the Court means that the presumption against pre-emption only applies in those unusual cases in which it is unclear whether a federal statute even touches on subject matter that the States may regulate under their broad police powers. I doubt that the Court is prepared to abide by this cramped understanding of the presumption against pre-emption. See, *e.g., Hillman* v. *Maretta*, 569 U. S. \_\_\_, \_\_\_ (2013) (slip op., at 6) ("There is therefore 'a presumption against pre-emption' of state laws governing domestic relations" (quoting *Egelhoff* v. *Egelhoff*, 532 U. S. 141, 151 (2001)).

Art. I, §4, cl. 1, a federal law that frustrates a State's ability to enforce its voter qualifications would be constitutionally suspect. *Ante,* at 15; see *ante,* at 4–8 (THOMAS, J., dissenting). The Court nevertheless reads the NVRA to restrict Arizona's ability to enforce its law providing that only United States citizens may vote. See Ariz. Const., Art. VII, §2. We are normally more reluctant to interpret federal statutes as upsetting "the usual constitutional balance of federal and state powers." *Gregory* v. *Ashcroft*, 501 U. S. 452, 460 (1991); see Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 540 (1947) ("[W]hen the Federal Government . . . radically readjusts the balance of state and national authority, those charged with the duty of legislating are reasonably explicit").

In refusing to give any weight to Arizona's interest in enforcing its voter qualifications, the Court suggests that the State could return to the Election Assistance Commission and renew its request for a change to the federal form. *Ante,* at 16–17. But that prospect does little to assuage constitutional concerns. The EAC currently has no members, and there is no reason to believe that it will be restored to life in the near future. If that situation persists, Arizona's ability to obtain a judicial resolution of its constitutional claim is problematic. The most that the Court is prepared to say is that the State "might" succeed by seeking a writ of mandamus, and failing that, "might" be able to mount a constitutional challenge. *Ante*, at 17, n. 10. The Court sends the State to traverse a veritable procedural obstacle course in the hope of obtaining a judicial decision on the constitutionality of the relevant provisions of the NVRA. A sensible interpretation of the Act would obviate these difficulties.

## II

The NVRA does not come close to manifesting the clear

intent to pre-empt that we should expect to find when Congress has exercised its Elections Clause power in a way that is constitutionally questionable. Indeed, even if neither the presumption against pre-emption nor the canon of constitutional avoidance applied, the better reading of the Act would be that Arizona is free to require those who use the federal form to supplement their applications with proof of citizenship.

I agree with the Court that the phrase "accept and use," when read in isolation, is ambiguous, *ante,* at 6–7, but I disagree with the Court's conclusion that §1973gg–4(a)(1)'s use of that phrase means that a State must treat the federal form as a complete application and must either grant or deny registration without requiring that the applicant supply additional information. Instead, I would hold that a State "accept[s] and use[s]" the federal form so long as it uses the form as a meaningful part of the registration process.

The Court begins its analysis of §1973gg–4(a)(1)'s context by examining unrelated uses of the word "accept" elsewhere in the United States Code. *Ante,* at 7–8. But a better place to start is to ask what it normally means to "accept and use" an application form. When the phrase is used in that context, it is clear that an organization can "accept and use" a form that it does not treat as a complete application. For example, many colleges and universities accept and use the Common Application for Undergraduate College Admission but also require that applicants submit various additional forms or documents. See Common Application, 2012–2013 College Deadlines, Fees, and Requirements, https://www.commonapp.org/CommonApp/MemberRequirements.aspx (all Internet materials as visited June 10, 2013, and available in Clerk of Court's case file). Similarly, the Social Security Administration undoubtedly "accepts and uses" its Social Security card application form even though someone applying for a card

must also prove that he or she is a citizen or has a qualifying immigration status. See Application for a Social Security Card, Form SS–5 (2011), http://www.socialsecurity.gov/online/ss-5.pdf. As such examples illustrate, when an organization says that it "accepts and uses" an application form, it does not necessarily mean that the form constitutes a complete application.

That is not to say that the phrase "accept and use" is meaningless when issued as a "government *diktat*" in §1973gg–4(a)(1). *Ante,* at 7. Arizona could not be said to "accept and use" the federal form if it required applicants who submit that form to provide all the same information a second time on a separate state form. But Arizona does nothing of the kind. To the contrary, the entire basis for respondents' suit is that Proposition 200 mandates that applicants provide information that does not appear on a completed federal form. Although §1973gg–4(a)(1) forbids States from requiring applicants who use the federal form to submit a duplicative state form, nothing in that provision's text prevents Arizona from insisting that federal form applicants supplement their applications with additional information.

That understanding of §1973gg–4(a)(1) is confirmed by §1973gg–4(a)(2), which allows States to design and use their own voter registration forms "[i]n addition to accepting and using" the federal form. The Act clearly permits States to require proof of citizenship on their own forms, see §§1973gg–4(a)(2) and 1973gg–7(b)—a step that Arizona has taken and that today's decision does not disturb. Thus, under the Court's approach, whether someone can register to vote in Arizona without providing proof of citizenship will depend on the happenstance of which of two alternative forms the applicant completes. That could not possibly be what Congress intended; it is as if the Internal Revenue Service issued two sets of personal income tax forms with different tax rates.

We could avoid this nonsensical result by holding that the Act lets the States decide for themselves what information "is necessary . . . to assess the eligibility of the applicant"—both by designing their own forms and by requiring that federal form applicants provide supplemental information when appropriate. §1973gg–7(b)(1). The Act's provision for state forms shows that the purpose of the federal form is not to supplant the States' authority in this area but to facilitate interstate voter registration drives. Thanks to the federal form, volunteers distributing voter registration materials at a shopping mall in Yuma can give a copy of the same form to every person they meet without attempting to distinguish between residents of Arizona and California. See H. R. Rep. No. 103–9, p. 10 (1993) ("Uniform mail forms will permit voter registration drives through a regional or national mailing, or for more than one State at a central location, such as a city where persons from a number of neighboring States work, shop or attend events"). The federal form was meant to facilitate voter registration drives, not to take away the States' traditional authority to decide what information registrants must supply.[3]

The Court purports to find support for its contrary approach in §1973gg–6(a)(1)(B), which says that a State must "ensure that any eligible applicant is registered to vote in an election . . . if the valid voter registration form of the applicant is postmarked" within a specified period. *Ante,* at 8–9. The Court understands §1973gg–6(a)(1)(B) to mean that a State must register an eligible applicant if he or she submits a "'valid voter registration form.'" *Ante,*

_____

[3] The Court argues that the federal form would not accomplish this purpose under my interpretation because "a volunteer in Yuma would have to give every prospective voter not only a Federal Form, but also a separate set of either Arizona- or California-specific instructions." *Ante,* at 10, n. 4. But this is exactly what Congress envisioned. Eighteen of the federal form's 23 pages are state-specific instructions.

at 9. But when read in context, that provision simply identifies the time within which a State must process registration applications; it says nothing about whether a State may require the submission of supplemental information. The Court's more expansive interpretation of §1973gg–6(a)(1)(B) sneaks in a qualification that is nowhere to be found in the text. The Court takes pains to say that a State need not register an applicant who properly completes and submits a federal form but is known by the State to be ineligible. See *ante*, at 12–13. But the Court takes the position that a State may not demand that an applicant supply any additional information to confirm voting eligibility. Nothing in §1973gg–6(a)(1)(B) supports this distinction.

What is a State to do if it has reason to doubt an applicant's eligibility but cannot be sure that the applicant is ineligible? Must the State either grant or deny registration without communicating with the applicant? Or does the Court believe that a State may ask for additional information in individual cases but may not impose a categorical requirement for all applicants? If that is the Court's position, on which provision of the NVRA does it rely? The Court's reading of §1973gg–6(a)(1)(B) is atextual and makes little sense.

\* \* \*

Properly interpreted, the NVRA permits Arizona to require applicants for federal voter registration to provide proof of eligibility. I therefore respectfully dissent.